612 P.2d 1175

**Lilian M. COMPTON, Plaintiff-Appellant,**

v.

**J. Roger COMPTON,**
**Defendant-Respondent.**

**No. 12809.**

Supreme Court of Idaho.

May 29, 1980.

Rehearing Denied July 22, 1980.

Charles D. Coulter of Coulter & Roos, Charles E. Mooney of Lyons, Mooney & Bohner, Boise, for plaintiff-appellant.

Loren C. Ipsen of Moffatt, Thomas, Barrett & Blanton, Boise, for defendant-respondent.

McFADDEN, Justice.

Plaintiff-appellant Lilian M. Compton (hereafter wife) and defendant-respondent J. Roger Compton (hereafter husband) were married on June 15, 1956. In early 1974 the two were separated and in July of that year wife instituted an action for divorce. On August 19, 1974, husband not appearing, a default judgment of divorce was granted. As we indicate below, the present action does not take the form of an appeal from the entry of divorce or a motion to modify the decree: the record leaves no doubt that this action is one independent of the 1974 action for divorce.

The divorce decree incorporated a property settlement agreement which the parties had entered on August 15, 1974. The agreement, signed by both parties and by their attorneys, provides for distribution of property and for custody of the parties' two minor children.

Two and one-half years later, in early 1977, wife filed the present suit seeking to set aside the property settlement agreement on the grounds that it had been procured by misrepresentation and fraud on the part of husband. Her complaint prayed for damages to adjust the inequitable distribution of the community property, and for punitive damages. After filing of affidavits and limited discovery, the court granted husband's motion for summary judgment, and wife appeals.

Husband's motion for summary judgment was supported by various affidavits, including his own, two of his accountant, Marcel Learned, and one of wife's attorney at the time of the property settlement agreement. Husband's affidavit states that at the time wife requested a divorce she indicated a desire for husband to have custody of their two minor children, and to take no part of the community property, so that it would all be available for husband to provide proper support for the children. Husband also states that he discouraged an unequal settlement and urged wife to contact his accountant so as to arrive. at an equitable division. In his affidavit, the accountant

states that wife and her attorney met with him to discuss the financial condition of the community, and that wife again indicated that she wished to take no part of the community property. He states that he also encouraged her to consider an equitable division, and that they finally arrived at an appropriate figure. The affidavit of wife's then attorney states that wife did not wish to achieve a mathematically equal division of the community since she felt that husband would need the extra assets to care for the children. The property settlement agreement provides that wife is to receive an automobile, various household effects, beneficiary interest in a life insurance policy, half-interest in a property investment and $24,000 to be paid in monthly $200 installments; it also grants husband the remainder of the community and provides that he retain custody of the two minor children.

In opposition to the motion for summary judgment, wife filed her affidavit in which she states that prior to the formation of the property settlement agreement in 1974, she had had numerous occasions to discuss property issues with husband and that at all times he had represented to her that the community was ·worth little. She also states that during the marriage she had little or nothing to do with decisions regarding investment or management of the community and that in forming the property settlement agreement she relied entirely upon the representations of husband and his accountant.

Wife argues that information acquired subsequent to entering the property settlement agreement indicates that husband misrepresented the state of the community to her with respect to at least three matters: the community's acquisition of stock in Compton Transfer & Storage Co. and of an interest in the company's pension-profit sharing plan; the value of real property owned by the community and referred to as the Garden Valley Ranch; and the value of stock of a corporation known as Micronutrients International, Inc. Wife's complaint alleges her belief

"that the true extent and value of the net community worth at that time exceeded One Hundred Thousand and no/100 ($100,000.00) DOLLARS, and was not Forty Four Thousand Two Hundred Thirty-Four and no/100 ($44,234.00) DOLLARS, as represented by [husband]; and [wife] would not have entered into said agreement had she been informed of the true extent and full value of the community interests in property."

Deposition of wife and two bankers, supplemental affidavits of wife, and the affidavit of the head bookkeeper of Compton Transfer & Storage Company were also before the court in ruling on husband's motion.

The district court assumed, without specifically deciding, that the allegations of fraud in the complaint invoked the jurisdiction of the court, and that wife failed to show clearly and convincingly that husband had procured the property settlement agreement by fraud or misrepresentation. It therefore granted husband's motion.

On appeal, wife urges that the district court erred in treating her action as one to modify a divorce decree rather than as one for reformation of a contract; that the burden of proof of the absence of fraud rested on husband and that he failed to carry that burden; and that the district court erred in considering the affidavit of wife's former attorney.

I

■ Determining the correct posture of this action requires us to determine whether the property settlement agreement was merged into the divorce decree. Of course, merger, or its absence, is a question of the parties' intent. In this case we may look to both the agreement itself, and the divorce decree. Paragraph XIV of the agreement reads as follows.

"*Action for divorce* :

It is agreed by the parties that the wife has instituted an action for divorce in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Boise. It is further agreed that this agreement shall be introduced in

evidence in the trial of said divorce action, and subject to the approval of the court, shall be ratified and confirmed in the decree of divorce in the event such a decree is granted."

Paragraph 5 of the divorce decree states: "5. That all of the terms, provisions and conditions of that certain property settlement and child custody agreement dated the 13th day of August, 1974, be and the same are hereby ratified, confirmed, approved *and made a part of this judgment and decree of divorce* as if set out here in full." (Emphasis added.)

■ The language of these two documents is perhaps sufficiently clear for us to hold that it was the intent of the parties that the agreement be merged in the decree. But this court has made it clear that in close cases a presumption will be indulged in favor of a finding of merger. *Phillips v. Phillips*, 93 Idaho 384, 462 P.2d 49 (1969). After *Phillips*, if there are cross-references between the property settlement agreement and the divorce decree, a merger will be presumed unless the parties make it clear that the reference and inclusion is for some other purpose. We therefore hold that the parties' property settlement agreement in this case was merged in the later divorce decree, and as a result, that wife's action in this case is an independent one to attack the property settlement portions of the final judgment of divorce and not, as she has argued, to modify or rescind a contract.

## II

■ It is, of course, the general rule that once a judgment issues it is *res judicata* with respect to all issues which were or could have been litigated. There are a number of avenues, however, for attacking a judgment. It is subject to appeal to the Idaho Supreme Court within 42 days of its entry, I.C. § 13–201, I.A.R. 14(a); and the parties may move the district court to amend the judgment, or for a new trial, within ten days of its entry, I.R.C.P. 59(b) and 59(e). In this case these time limits have long since passed. In addition, in Ida-

ho, divorce decrees may always be modified with respect to alimony, I.C. § 32–706, and child custody, I.C. § 32–705. As noted above, however, this case involves the property settlement portions of a decree, and this court has specifically held that such portions of the decree are not modifiable, except by motion in the original action within the applicable time limitations. *Paul v. Paul*, 97 Idaho 889, 556 P.2d 365 (1976); *Lowe v. Lowe*, 92 Idaho 208, 440 P.2d 141 (1968).

Finally, provision for the modification of all final judgments is made in I.R.C.P. 60(b). The rule provides for two means of attacking a decree: first, by motion, for the reasons set out in 60(b)(1) through (6). I.R. C.P. 60(b)(3), provides for modification where the judgment is obtained by "fraud (whether heretofore denominated extrinsic or intrinsic), misrepresentation, or other misconduct of an adverse party . . . ." The rule also provides, however, that a motion for modification made pursuant to 60(b)(3) must be made within 6 months of the judgment's having become final. That time limit has, again, passed in this case. Lest confusion arise, we note specifically that such a motion would be made within the context of the original action as opposed to taking the form of a separate action altogether, with which were are presented in the instant case.

I.R.C.P. 60(b) also specifically preserves three preexisting means of attacking a final judgment. This part of the rule reads as follows:

"This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding, or to set aside, as provided by law, within one (1) year after judgment was entered, a judgment obtained against a party who was not personally served with summons and complaint either in the state of Idaho or in any other jurisdiction, and who has failed to appear in said action, or to set aside a judgment for fraud upon the court."

■ The rule's preservation of these three powers of the district court, to enter-

tain an equitable independent action to relieve a party from judgment, to challenge, within one year, a judgment entered against a party not served, and to set aside a judgment for fraud upon the court, does not amount to an affirmative grant of power; instead, it only guarantees whatever power existed prior to the rule's promulgation. *Simons v. United States*, 452 F.2d 1110 (2d Cir. 1971).[1]

■ The term "fraud upon the court" contemplates more than interparty misconduct, and, in Idaho, has been held to require more than perjury or misrepresentation by a party or witness, even where the misrepresentation was made to establish the court's jurisdiction. *Willis v. Willis*, 93 Idaho 261, 460 P.2d 396 (1969). Apparently such fraud will be found only in the presence of such "tampering with the administration of justice" as to suggest "a wrong against the institutions set up to protect and safeguard the public . . .." *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250, 1256 (1944) (fraud upon the court found where attorney for patent holder wrote article describing patent as unique, and arranged for publication in trade journal under name of ostensibly disinterested expert; court relied on article in reaching decision; construing identical language of F.R.C.P. 60(b)); 11 Wright and Miller, Federal Practice and Procedure § 2870 (1973). In any case, wife has not alleged, nor does the record contain evidence which suggests, that the divorce decree was obtained as a result of a fraud upon the court.

The record also does not suggest that wife was not personally served with summons and complaint, she having brought the original action. In any case, the one year time limit prescribed by the rule (and its precursor, I.C. § 5–905, repealed S.L. 1975, ch. 242, § 1, effective March 31, 1975) has run in this case.

■ There is no expressed time limit, however, with respect to the independent

action to relieve a party from judgment. As the court held in *Gregory v. Hancock*, 81 Idaho 221, 340 P.2d 108 (1959), the power of the courts to entertain such an action is "inherent, not statutory, and is not subject to the time limitations imposed by the statute" which provided for attack of default judgments, I.C. § 5–905, (now contained in I.R.C.P. 60(b)). 81 Idaho at 227, 340 P.2d at 111. *See, supra.* The court did hold in *Gregory*, however, that the independent action must be brought within a "reasonable time." 81 Idaho at 237, 340 P.2d at 112. Husband has not argued in this action that an unreasonable period of time has elapsed since entry of judgment, and we express no opinion on the question. Instead, we hold in this case that wife is not precluded by the passage of time from bringing her independent action for relief from judgment. We turn now to a consideration of what burden wife must carry to support such an action.

Historically, the independent action in equity to relieve a party from a judgment would lie only in the presence of extrinsic, as opposed to intrinsic, fraud. *See Parke v. Parke*, 72 Idaho 435, 439, 242 P.2d 860, 868 (1952). A typical definition of extrinsic fraud is that it is

"such as was not in issue in the former suit, nor could have been put in issue by the exercise of reasonable diligence. Fraud is extrinsic where a party is prevented by trick, artifice, or other fraudulent conduct from fairly presenting his claims or defenses or introducing relevant and material evidence." 7 Moore's Federal Practice, ¶ 60.37[1], pp. 612–13. (Citations omitted.)

See *United States v. Throckmorton*, 98 U.S. 61, 25 L.Ed. 93 (1878). While the distinction between extrinsic and intrinsic fraud may be easy to state and understand in the abstract, it has proved extremely difficult of application to actual cases. As one commentator puts it, "the distinction [between extrinsic and intrinsic fraud] rests on cloud-

---

1. Idaho's Rule 60(b) is identical in all material respects to Rule 60(b) of the Federal Rules of Civil Procedure. We will therefore look to rul-

ings on the scope of the federal rule for guidance in interpreting the Idaho rule.

ed and confused authorities, its soundness as a matter of policy is very doubtful, and it is extremely difficult to apply." 11 Wright & Miller, Federal Practice and Procedure, pp. 240–1 (citations omitted.) As a result, the Federal and Idaho Rules of Civil Procedure have abrogated the distinction between extrinsic and intrinsic fraud with respect to motions for relief from judgment, I.R.C.P. 60(b)(3), and many commentators have urged the same abrogation with respect to the independent action. Noting that it is at times "a journey into futility to attempt a distinction between extrinsic and intrinsic matter," Professors Moore and Lucas argue that

> "the more reasonable course to pursue is to weigh the degree of the fraud and the diligence with which such was unearthed and proceeded on, hold the claimant for relief to strict standards of pleading fraud and other elements necessary to sustain action, and to ·clear and convincing proof, if the case reaches that stage; and resolve any doubts against relief and in favor of the finality of the judgment attacked." 7 Moore's Federal Practice, pp. 617–19 (citations omitted.)

Wright and Miller agree that the distinction "ought not to persist as a limit on independent actions now that it has been abolished for motions." 11 Wright & Miller, Federal Practice and Procedure, § 2868, p. 241 (citation omitted). *See also*, Comment, Rule 60(b): Survey and Proposal for General Reform, 60 Cal.L.Rev. 531 (1972); Note, Attacking Fraudulently Obtained Judgments in the Federal Courts, 48 Iowa L.Rev. 398 (1963).

We agree that the distinction between intrinsic and extrinsic fraud is simply another way of phrasing the question, and is of limited utility in actually resolving it. The task remains to strike a balance between two competing interests. On the one hand rests the need for finality of actions. On the other is the decidedly unsavory "spectacle of the law bearing down mercilessly, and perhaps ruinously, to collect and deliver over the fruits of undoubted fraud," *Shammas v. Shammas*, 9 N.J. 321, 88 A.2d 204, 209 (1952), quoting 126 A.L.R. 393.

Invoking oversimplified definitional concepts does not materially aid in accomplishing this task.

Among the non-conclusory points we *can* make are that the independent action in equity is a most unusual remedy, available only rarely and under the most exceptional circumstances. It is most certainly not its function to relitigate issues determined in another action between the same parties, or to remedy the inadvertence or oversight of one of the parties to the original action. It will lie only in the presence of an extreme degree of fraud.

### III

Determining the degree of fraud demonstrated by particular facts requires an assessment of the nature of the relationship between or among the parties who are alleged to have acted fraudulently, and the character of the actual conduct involved. The relationship between husband and wife, present in this case, imposes a high duty of care which has two aspects. The first results from husband and wife's confidential relationship and is most obviously exemplified by the decaying privilege of interspousal immunity. The second results from Idaho's grant to the two spouses of equal control over the entirety of their community property. I.C. § 32–912. They thus have the power to encumber more than their own half of the community, which power imposes the solemn duty of a fiduciary, and continues until the moment of the marriage's termination. The power, and its attendant fiduciary duty, is not affected by the parties' separation pending divorce. *Suter v. Suter*, 97 Idaho 461, 546 P.2d 1169 (1976); *Parke v. Parke*, 72 Idaho 435, 242 P.2d 860 (1952); *Jorgenson v. Jorgenson*, 193 P.2d 728 (Cal.1948).

Husband notes that prior to equal management he was the sole manager of the community property, and argues that after July 1, 1974, the effective date of the equal management statute, this sole management, along with the attendant stringent duty, has declined or disappeared. His argument is unpersuasive. Husband's power singularly to bind the community has not disappeared; the onset of equal manage-

ment simply assures to the wife a similar power, and imposes a reciprocal duty. *E. g. Jensen v. Jensen*, 97 Idaho 922, 557 P.2d 200 (1976). As noted above, the parties retain equal management status and remain burdened with its attendant fiduciary duty until the moment of the marriage's termination.

This fiduciary duty extends to the parties' negotiations leading to the formation of the property settlement agreement during marriage, and requires, at least, a disclosure by both parties of all information within their knowledge regarding the existence of community property and of pertinent facts necessary to arrive at a reasonable valuation of the property. Like a business partner, each spouse is free to adopt a position favorable to himself or herself regarding the property's valuation, its inclusion in the community, or other such issues. They are not free, however, to resolve such issues unilaterally by concealing the very existence of particular items or amounts of property.

In *Sande v. Sande*, 83 Idaho 233, 360 P.2d 998 (1961), the court held that where a separation agreement is unfair and inequitable, and where overreaching appears, the agreement may be avoided despite the absence of actual fraud or duress. That is, the presence of overreaching automatically shifts the burden to the party benefited by the unequal agreement to show that the community should not be reapportioned. Overreaching often appears where one of the parties is not represented by independent counsel. *Sande* itself provides a graphic example. In that case, husband and wife were living together when the challenged property settlement agreement was entered into. Husband apparently coerced wife to abandon the marriage, along with considerable property, and she was prevented from retaining independent counsel by husband's threat to "institute insanity proceedings against her" for less than immediate compliance. 82 Idaho at 235, 360 P.2d at 999. *See also, Jensen, supra.* Retention of independent counsel cannot, however, be said automatically to dispel the presence of overreaching. *Parke, supra.*

No such overreaching has been proven or even alleged in this case: wife's most serious charge is that husband misrepresented the state of the community. As a result, the singular fact of an unequal division of the community property does not in itself require a court to modify the agreement to achieve equality. Instead, to survive husband's motion for summary judgment the burden rests with wife, as challenging party in this case, to allege such fraud as to support an independent action for relief from judgment.

## IV

With this understanding of the extent of husband and wife's fiduciary duty in mind, we turn to an analysis of the conduct in this case, both husband's alleged misrepresentations, and wife's diligence in discovering and challenging them in the prior action, to determine whether it presents fraud in such degree as to support an independent action for relief from judgment.

Wife first complains that although husband revealed the existence of his stock in Micronutrients International Inc., and listed its value as $0.00, he did not reveal that a contract for the sale of the stock had been entered into, and that this contract would eventually yield the community some $37,000. Wife also states in her deposition, however, that she had some information regarding the existence of the sale contract, apparently as a result of having been present during a conversation between her husband and a business associate.

Husband counters with the affidavit of his accountant in which he states that he informed wife of the contract of sale, and that this "sale" was in fact of a tentative nature, with considerable options to cancel afforded to the potential buyer. Husband argues on appeal that he has yet to realize any benefit as a result of the sale.

Wife's allegation does not support her independent action for relief from judgment because she acknowledges her awareness at the time of divorce of the possible existence of a sale contract. She cannot fail to act on information which she possess-

es, and then urge that husband acted fraudulently by failing to give her the information she already possessed.

Wife next attacks husband's valuation of the family's property in Boise County, Idaho, known as the Garden Valley Ranch. The property settlement agreement lists the property at $150,000, the purchase price. Husband offers a document entitled "Garden Valley Property" which he claims was shown to wife at the time of the property settlement negotiations. The document acknowledges that a recent informal appraisal indicated that the property had a higher fair market value than its purchase price, but that husband considered this higher value to be "realistically only hoped for," unrealizable absent a sale, and that as a result he was listing the property on the agreement at its purchase price.

■ We expressly decline to decide whether we would agree with husband's valuation if this matter were before the court on appeal from the divorce decree, *Simplot v. Simplot*, 96 Idaho 239, 526 P.2d 884 (1974), for we need only note that husband made full disclosure of the existence of the property and of the fact that its value had appreciated. In her deposition wife repeatedly acknowledges that she was suspicious of husband's valuation, that she felt that the actual value might be higher, and that husband had on a number of occasions said as much. She was thus on notice and free to challenge husband's valuation by coming forward with her own experts, or otherwise attempting to convince the trier of fact that husband's valuation was

incorrect. Her inadvertence or misjudgment in failing to do so when the opportunity was ripe is an excellent example of the type of conduct which the independent action to relieve a party from judgment will not lie to correct.

■ The same is true with respect to wife's claims regarding the community's acquisition of stock in Compton Transfer and Storage and of an interest in the company's pension profit sharing plan: in both cases, wife's allegations are that husband revealed to her the fact of these acquisitions. This disclosure discharged husband's obligations in the bargaining process which led to the parties' entering the property settlement agreement. We therefore hold that wife's allegations, when viewed in a light most favorable to her, do not support her claim that husband engaged in a sufficiently egregious course of conduct that the court should have entertained her independent action for relief from judgment.

V

Wife also complains that the court erred in admitting the affidavit of the attorney who represented wife during negotiations for the property settlement agreement.[2]

The starting point for an analysis of attorney-client communications in Idaho is I.C. § 9–203(2), which states that

"[a]n attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment."

2. The affidavit reads as follows.

"I was the attorney for the plaintiff, Lilian M. Compton, in the matter of her divorce from J. Roger Compton, Case No. 242 in the Fourth Judicial District, Boise County, Idaho.

I was contacted by Mrs. Compton on or about July 11, 1974, concerning her desire to secure a divorce. Thereafter, there were numerous conferences and telephone conversations between myself and Mrs. Compton relating to the various matters involved in the divorce proceeding. Among the matters discussed were the property interests of the parties. In this regard, I contacted Mr. Compton who advised me that his accountant, Marcel Learned of the accounting firm of Ernst & Ernst, was in possession of the financial infor-

mation relating to the property and assets of the Comptons. Mr. Compton gave permission for me to meet with Mr. Learned and to review the financial information in his possession. I then contacted Mr. Learned, advised him of my representation of Mrs. Compton, further advised him that I would need full and complete disclosure of the Compton financial records in his possession, and arranged for a meeting.

On or about August 2, 1974, Mrs. Compton and I met with Mr. Learned at his office. Mr. Compton was not present. At this meeting we discussed in detail the Compton property and financial matters, including but not limited to shares of stock of Gallagher and Jeppesen, Inc., Inbanano, the Crane Creek property, Micronutrients International, Inc., the Fairview property, Briarhill, Ltd., insurance, personal property,

This court has held that this privilege to refuse to testify runs to communications only, *Later v. Haywood*, 12 Idaho 78, 85 P. 494 (1906), and it is self-evident that it extends only to those communications which are intended to be confidential. Thus the attorney's general statements, such as that wife contacted him, that he arranged to meet with husband's accountant, and so on, are clearly not privileged since they are not attorney-client *communications*. Nor is any of the affidavit which discusses the meeting with the accountant privileged. It does not discuss communications, and even if it did they would not be privileged since they were made in the presence of a third person, in this case the agent of the adverse party. We cannot reasonably conclude that communications made in such an environment were ever intended to be privileged. *See, e. g.*, Cleary, ed., McCormick on Evidence, 2d ed. 1972, § 91 at 187–8.

Finally, the attorney's statement that wife did not desire an equal division of the property is not privileged since the same communication was made by wife other than to her attorney: first, to her husband and to his accountant, according to their affidavits (which are uncontradicted in this regard); and second, in her own deposition. When asked why she had not contested the $150,000 valuation of the Garden Valley Ranch during the meeting with husband's accountant, wife responded:

the Garden Valley property, Compton Transfer and Storage Co., tax refunds and liabilities, separate property, valuation of property, indebtedness and encumbrances, etc. We reviewed not only the estimated balance sheet of July 31, 1974, bearing Mr. Compton's signature, but also numerous other records and data which were in Mr. Learned's possession. Mr. Learned was very cooperative, and I have no reason to believe that he did not fully and candidly disclose all the information in his possession.

Based on the information disclosed during the meeting with Mr. Learned, a Property Settlement and Child Custody Agreement was prepared and was later executed by both parties and their respective attorneys. It was Mrs. Compton's position that she did not desire an equal division of the community property and that she felt that Mr. Compton would need the

"A. I really didn't see any need for it.
Q. You saw no need for it. Well, is one of the reasons that you thought no need for it is because you really didn't—you were not trying to divide this property on a 50–50 basis?
A. Yes, I would say that's correct.

.  .  .  .  .

Q. Well, isn't it a fact, Mrs. Compton, that [your attorney] told you that you were entitled to more of the property if you wanted it than what the agreement provided for?
A. Yes.
Q. And you told him you didn't care, you didn't want any more of the property?
A. Yes.

.  .  .  .  .

Q. Oh, come now. Didn't [your attorney] explain to you—
A. Yes, he did.
Q. And you knew that it was not 50–50?
A. Yes.
Q. And you told him it didn't matter?
A. Basically, I did.
Q. As a matter of fact, part of the reason that you said that it didn't matter was because your primary concern was simply getting out of the marriage?
A. Yes.
Q. And secondly, leaving the minor children with their dad?

property for the support, maintenance and education of the children. Paragraph 11 on page 9 of the agreement contained the provision, "It being further understood that the division of the property was made on a basis not necessarily commensurate with an equal division in strict dollar value."

The agreement referred to above was drafted on the basis of the financial picture of the Comptons as disclosed by the materials furnished by Mr. Learned, although, for the reasons stated, no attempt was made, nor did Mrs. Compton express a desire, to achieve a mathematically equal division of property. I did not at the time of preparation of the agreement, nor do I now, have knowledge or information of any property, assets or values not disclosed in the information made available through Mr. Learned.

Dated this ___ day of February, 1977."

A. Yes.

As McCormick on Evidence puts it, "if the same statements have been made by the client to third persons on other occasions this is persuasive that like communications to the lawyer were not intended as confidential. Id. at 188. We see no error.

This case is affirmed. No costs allowed.

BAKES and BISTLINE, JJ., and SCOGGIN and DUNLAP, JJ., Pro Tem., concur.