IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 47857

| | | |
|---|---|---|
| DEXTER C. VAN ORDEN, | ) | |
| | ) | |
| Petitioner-Appellant-<br>Cross Respondent, | ) | Boise, November 2021 Term |
| | ) | |
| | ) | Opinion filed: August 3, 2022 |
| v. | ) | |
| | ) | Melanie Gagnepain, Clerk |
| CHRISTINE M. VAN ORDEN, | ) | |
| | ) | |
| Respondent-Cross Appellant. | ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bingham County. Darren B. Simpson, District Judge. Stephen J. Clark, Magistrate Judge.

The decision of the district court is affirmed in part and reversed in part.

Castleton Law Office, Blackfoot, for Appellant. Trevor L. Castleton argued.

Beard St. Clair Gaffney PA, Rexburg, for Respondent. Jeffrey D. Brunson argued.

---

ZAHN, Justice.

This matter concerns the enforceability of a property settlement agreement entered into by a married couple prior to their divorce. Dexter Van Orden ("Dexter") appeals an intermediate appellate decision of the district court ruling that the property settlement agreement he executed with Christine Van Orden ("Christine") was void and unenforceable. Christine cross-appeals the district court's decision affirming other conclusions of the magistrate court. For the reasons set forth below, we affirm in part and reverse in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Christine and Dexter married in August 2007 and have four minor children born during their marriage. Christine works as a nurse in a Neonatal Intensive Care Unit ("NICU"). Dexter and Christine also operated a ranch during their marriage. Dexter performed most of the ranch's day-to-day business and Christine performed some of the ranch's bookkeeping.

1

In late November 2016, Christine told Dexter she wanted a divorce. This revelation prompted a series of contentious discussions regarding the dissolution of their marriage, including how the community estate would be divided. Dexter maintains that Christine's position on the division of property was clear from their first conversation—she wanted her "car paid for and [her] student loans paid off." He claims that Christine was steadfast in this desire, expressing it in subsequent conversations about property division. Christine does not dispute that she requested to leave the marriage debt-free with her student loans paid off and her vehicle paid for. Christine noted that she believed that agreeing to less property would make Dexter more amenable to negotiating child custody. In addition, both Christine and Dexter discussed their desire to avoid a "nasty" divorce. Dexter later testified during the trial that nasty, to him, meant "destroy[ing] each other . . . [or] hurt[ing] our kids."

Christine and Dexter's discussions about the divorce continued into the late hours of December 21, 2016, and into the morning of December 22. A few days prior, Dexter had contacted an attorney to draft a property settlement agreement ("the PSA") dividing the community estate should the parties divorce. The attorney finished drafting the PSA by December 22 and Dexter drove to Christine's work that afternoon seeking to have her sign the PSA.

The parties' narratives about the circumstances surrounding the execution of the PSA vary dramatically. Christine testified that she was very emotional when confronted with the PSA and completely unaware Dexter had it drafted with help from counsel. She stated that she read the PSA at least three times, each time finding some provision or term she did not understand. However, she did not verbalize any questions or concerns to Dexter at the time. All the while, she contends that Dexter paced back and forth, never straying more than about twenty-five feet from where she was reading the PSA. Finally, she stated that she told Dexter she would like to have an attorney read the PSA before she signed. She contends that Dexter, in response, told her that if she did not sign the PSA at that time "things would get nasty." At that point, Christine signed the PSA.

As to what Christine perceived Dexter to mean when he stated things would get nasty, she testified at trial that

> him being nasty – after knowing this man for nine years, being married to this
> man for nine years, "nasty" to me meant nasty with my kids, nasty financially,
> nasty with the reasons with my dad. He had threatened many times to get a

2

restraining order against my dad to explicit [sic] everything: My family name, my dad, my whole family. So when he says he's going to get nasty, I feel like this was him being gentle and soft in the fact that we were in a public place, in the lobby in the middle of the NICU. And again, "nasty" being, yeah, we both didn't want a nasty divorce but nasty only on his terms that if I sign this or not.

With respect to Christine's concerns about Dexter impugning her family name and her father, Christine expressed concern that Dexter would disclose highly sensitive details about her private family life, particularly allegations of childhood sexual abuse by her father.

Dexter, in contrast, disputed nearly every aspect of Christine's testimony concerning her execution of the PSA. For instance, he testified that Christine, far from being emotionally overwhelmed, appeared relieved following their conversation on the evening of December 21 and into the early morning hours of December 22. In addition, he stated that he did not "hover" over Christine while she reviewed the PSA, nor did he recall Christine asking for an attorney to look over the PSA before she signed. Dexter also claimed that Christine was aware that he had contacted an attorney to draft the PSA and did so at Christine's request. Finally, Dexter testified that he never told Christine that if she did not sign the PSA that things would turn "nasty."

As to the content of the PSA, it purported to "establish and determine the rights [that Christine and Dexter] shall have in certain community and/or separate real and personal property[.]" The PSA noted the parties' intentions, including: "to avoid litigation and intrusion into their professional and personal lives . . . which would otherwise occur if th[e PSA] had not been entered into by them" and "to protect Christine from certain debts and business risks associated with Dexter's ranching business." Additionally, the PSA provided that "Christine acknowledges that even though Dexter is receiving an uncertain dollar amount of equity in real and personal property transferred to him by th[e PSA], it is fair because th[e PSA] insulates her from most, if not all, of the liability associated with Dexter's ranching business."

With respect to the couple's real and personal property, the PSA provided that Christine

relinquishes and quitclaims all right, title and interest to Dexter's ranching business including the following described real . . . property . . . [a] BLM lease; [and] Longhurst ranch property which is also the subject of quitclaim deed(s) which describe said property in more complete detail and [sic] executed by Christine to carry out the intent of this Agreement[.]

Under the PSA, Christine received no real property but did receive the following items of personal property: a 2008 GMC Yukon vehicle, the furniture in the marital home, and her personal effects. In addition, the PSA insulated Christine from responsibility for any of the

3

financial obligations of the ranching business and required Dexter to pay off the balance of Christine's student loans and the car loan for the 2008 GMC Yukon. The PSA did not address child custody or visitation.

Beginning in November 2016, concurrent with the parties' discussions concerning divorce, Christine entered into an affair with a coworker. It is unclear when, precisely, Dexter learned of the affair, but he confronted Christine about it on or around January 1, 2017. However, he testified that Christine did not tell him directly that she had an affair until after he filed for divorce on January 11, 2017.[1]

## B. Procedural History

Dexter filed his original petition for divorce on January 11, 2017. In that petition, Dexter did not request enforcement of the PSA and instead requested that the parties' community property and debts be divided equitably between them. Dexter later moved the magistrate court to allow him to file an amended petition for divorce. Shortly thereafter, the parties stipulated to Dexter filing an amended petition.

In his amended petition for divorce, Dexter requested that the magistrate court enforce the terms of the PSA between the parties. Christine answered on April 14 and asserted affirmative defenses of duress and unconscionability with respect to enforcement of the PSA.

Following the amended petition and Christine's response, the parties engaged in extensive and acrimonious litigation concerning the temporary custody of the children. On October 30, 2017, Dexter moved to bifurcate the trial in this matter, seeking to have one trial on the validity and enforceability of the PSA and another relating to the custody and visitation of the children. The magistrate court granted the motion to bifurcate on November 2.

Subsequently, on February 7, 2018, the magistrate court conducted a one-day bench trial on the enforceability of the PSA. Both Christine and Dexter testified as to the circumstances surrounding the execution of the PSA. In addition, Dexter testified as to the value of the real and personal property he received pursuant to the PSA and the outstanding liabilities of the ranch. The magistrate court also admitted a balance sheet, created in anticipation of obtaining an operating loan for the ranch in 2017, which indicated the total equity in the ranch was approximately $1.3 million roughly two weeks before the parties signed the PSA.

---

[1] This is mentioned only because, as discussed below, the magistrate court found Christine's affair relevant to her motivations to sign the PSA.

The magistrate court issued an order on the enforceability of the PSA on February 15, 2018. With regard to the execution of the PSA, the magistrate court found that "emotions were running high" at the time the PSA was negotiated and signed. The magistrate court noted the conflicting testimony concerning Dexter telling Christine the divorce would get "nasty" if she did not sign the PSA, and concluded that "[t]he court can find that [Dexter] did issue the threat as it is consistent with their prior discussions of divorce." It further found that Dexter's physical presence at the signing of the PSA did not overbear Christine's will, and that she did not communicate at that time that she did not understand all of the PSA.

The magistrate court found that the approximate value of the real and personal property Dexter received was $1,853,594 and that the total amount of liabilities Dexter assumed responsibility for under the PSA was roughly $1,724,075. Thus, the magistrate court found that Dexter received around $130,000 in equity.[2] The magistrate court then deducted the approximate value of Christine's student loans that Dexter had agreed to satisfy. It approximated the loan debt at $81,000[3] and concluded that the equity Dexter received under the agreement was closer to $54,000.[4] The magistrate court, in contrast, found that the value of the vehicle Christine received under the PSA was $30,000 in addition to the value of her student loan payoff.

Given the above factual findings, the magistrate court drew the following conclusions of law: (1) the PSA was procedurally valid under Idaho Code section 32-917; (2) the PSA was not a product of duress; and (3) the PSA was not unconscionable. With respect to its first conclusion, the magistrate court noted that neither party argued the PSA was procedurally invalid and therefore, the magistrate court provided no further analysis.

Next, as to its conclusion that the PSA was not the product of duress, the magistrate court determined that a variety of factors weighed both for and against a conclusion of duress.

---

[2] $1,853,594 – $1,724,075 = $129,519.

[3] Christine argued on appeal to the district court that the magistrate court had overvalued her loans by $70,000 or more, and that the evidence suggested her outstanding loan balance was $5,328.22. She notes that Dexter conceded that the $5,000 figure was the correct approximation of her student loans. However, since the district court determined that the PSA was illegal on other grounds, it did not determine whether the magistrate court erred in valuing Christine's student loans and instead remanded for further factual findings on the value of the community estate. Although Christine referenced the magistrate court's finding in a footnote "to provide further context regarding the lower courts' errors in failing to determine the Property Settlement Agreement was substantively unconscionable[,]" she has not raised the valuation of her student loans as an issue on appeal. Therefore we will not address this issue.

[4] The magistrate court only conducted a rough estimate, subtracting an estimated $1.8 million in debt from the $1,853,594 in estimated equity to arrive at the $54,000 value. Applying the math to the specific figures, the estimated equity Dexter received would be around $49,000 as $1,853,594 – ($1,724,075 + $81,000) = $48,519.

5

Weighing against duress, it noted that (1) the PSA was signed at Christine's place of work where she had an opportunity to retreat behind locked doors; (2) the document reflected that Christine had an opportunity to seek advice from counsel; (3) as an LPN, Christine was well-educated and handled a high-stress job in the NICU; (4) her work environment would be supportive of her, not Dexter; (5) Dexter "did not bring any third parties to further influence the decision"; (6) the PSA included her wishes to exit the marriage debt-free with her vehicle; (7) Christine was not financially dependent on Dexter given her job, training, and family resources; and (8) "[o]ther than the 'nasty' threat there were no threats of violence or any physical pressure." The magistrate court also considered the following factors in favor of duress: (1) Christine's emotions were running high at the time of signing the PSA; (2) Dexter threatened the divorce would turn "nasty" if she did not sign, and that Christine took the threat seriously given her affair and "concerns over her father"; (3) Christine did not have the PSA reviewed by counsel; and (4) Christine wanted the agreement to include provisions concerning child custody, which it did not. After weighing these considerations, the magistrate court concluded that the preponderance of the evidence did not establish that Christine's will was overborne and therefore her signature on the PSA was voluntary.

Finally, the magistrate court concluded that the PSA was not unconscionable. First, it reasoned that the PSA was not procedurally unconscionable for largely the same reasons that it was not a product of duress. That is, the circumstances surrounding the bargaining process did not indicate that the PSA was signed involuntarily. Next, the magistrate court reasoned that the PSA was not substantively unconscionable because Christine received a $30,000 vehicle and freedom from "threats of potential creditors" in exchange for losing approximately $65,000 in equity.

Subsequently, the magistrate court held the second portion of the bifurcated trial, considering issues of child custody and visitation. Following this proceeding, and the entry of the decree of divorce, Christine moved the magistrate court to reconsider its previous order with respect to the PSA and moved for a new trial on the issue of the enforceability of the PSA. Christine challenged the magistrate court's order on the PSA on two grounds: (1) that the magistrate court had improperly calculated the value of the ranch (which Dexter received under the PSA) and (2) that the magistrate court applied the wrong standard in concluding the PSA was enforceable because it did not consider or apply the doctrine of overreaching.

On August 17, 2018, the magistrate court denied Christine's motion for reconsideration. With respect to overreaching, the magistrate court construed this Court's precedent on the issue to require either an intentional concealment of information by a spouse or a spouse lying for their own benefit. Applying that standard, the magistrate court concluded that the doctrine of overreaching was inapplicable because Dexter had neither concealed information from Christine nor lied for his own benefit to secure the PSA. Further, the magistrate court noted that the pressures on Christine to sign the PSA—her desire to conceal the affair and her concerns that sensitive information about her father and family would become public—resulted from "her personal issues/behaviors," not from Dexter. Thus, while the magistrate court acknowledged that Dexter had not acted with complete neutrality, he did not have to do so, and his conduct did not constitute overreaching.

Christine then appealed to the district court, raising the validity of the PSA as an issue. Pertinent here, Christine raised as an issue on appeal "[w]hether the Magistrate erred in adjudicating as enforceable the Property Settlement Agreement executed by the parties on December 22, 2016 [.]"

The district court heard oral argument on the appeal on November 25, 2019. Subsequently, on January 2, 2020, before the district court issued its decision in the matter, Christine filed a notice of supplemental authority pursuant to Idaho Appellate Rule 34(e), citing this Court's decision in *Papin v. Papin*, 166 Idaho 9, 454 P.3d 1092 (2019). While Christine only specifically quoted a portion of the *Papin* opinion discussing the doctrine of overreaching, she also attached the entirety of the opinion as an exhibit.

Then, on January 23, 2020, the district court issued its decision and order on appeal. In its order, the district court concluded that the magistrate court did not err in ruling that the PSA was valid because its findings that Christine had not established overreaching or duress as to the PSA were supported by substantial and competent evidence. However, the district court concluded sua sponte that the PSA was nonetheless invalid on two separate grounds: (1) that under *Papin*, the PSA was procedurally invalid because it conveyed real property but did not include Dexter's mailing address as required by Idaho Code section 32-917; and (2) the PSA was void as against public policy because it was secured by theft by extortion.

Dexter timely appealed. Christine then filed a notice of cross-appeal.

7

## II.    ISSUES ON APPEAL

1. Did the district court err in concluding that the PSA was procedurally invalid under Idaho Code section 32-917?

2. Did the district court err in concluding that the PSA violated public policy because it rested on illegal consideration?

3. Did the district court err in affirming the magistrate court's rulings that the PSA was not produced by overreaching nor signed under duress?

4. Is either party entitled to attorney fees on appeal?

## III.    STANDARD OF REVIEW

On review of a district court's intermediate appellate decision, this Court is "procedurally bound to affirm or reverse the decisions of the district court." *Papin v. Papin*, 166 Idaho 9, 18, 454 P.3d 1092, 1101 (2019) (quoting *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012)). However, in so doing, this Court,

> reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.

*Bailey*, 153 Idaho at 529, 284 P.3d at 973 (quoting *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008)). Conversely, if the district court affirmed the magistrate court's decision but the magistrate court's findings of fact and conclusions of law are not "(1) supported by the evidence in the record and (2) consistent with the law . . . [this Court] must reverse the district court." *Valentine v. Valentine*, 169 Idaho 621, __, 500 P.3d 514, 518 (2021) (quoting *State v. Dacey*, 169 Idaho 102, __, 491 P.3d 1205, 1210 (2021)).

This Court freely reviews questions of law. *Porcello v. Estate of Porcello*, 167 Idaho 412, 421, 470 P.3d 1221, 1230 (2020). "Whether a contract is illegal is a question of law for the court to determine from all the facts and circumstances of each case." *Jim & Maryann Plane Family Tr. v. Skinner*, 157 Idaho 927, 933, 342 P.3d 639, 644 (2015) (quoting *Farrell v. Whiteman*, 146 Idaho 604, 608, 200 P.3d 1153, 1157 (2009)). A marital settlement agreement is a contract. *See* I.C. § 32-917 (setting forth the requirements for "contracts for marriage settlements").

8

## IV. ANALYSIS

**A. The district court erred in concluding that the PSA was procedurally invalid under Idaho Code section 32-917.**

Dexter argues that Christine failed to assert that the PSA was procedurally invalid before either the magistrate court or the district court. Therefore, she failed to preserve that argument on appeal and the district court erred in sua sponte raising the issue and concluding the PSA was unenforceable because it ran afoul of the statutory formalities for postnuptial agreements set forth in Idaho Code section 32-917. Dexter also argues that even if the district court could properly consider the issue, it erred in concluding the PSA did not comply with section 32-917 because it did not require his mailing address since it did not convey real property. Christine, in contrast, maintains that the district court could permissibly consider the PSA's procedural validity because her notice of supplemental authority, filed with the district court pursuant to I.A.R. 34, cited this Court's decision in *Papin*, which discussed the requirements of section 32-917. She also argues that the district court correctly determined that the PSA conveyed real property and, thus, required Dexter's mailing address to comply with section 32-917.

We decline to address whether the PSA complied with section 32-917 because we conclude that Christine failed to preserve the issue for appeal. Consequently, we hold the district court erred in addressing it sua sponte on intermediate appeal.

To begin, we hold that failure to comply with the statutory formalities of section 32-917 is an affirmative defense, which a party can waive if she fails to assert it before the trial court. Idaho Rule of Family Law Procedure ("I.R.F.L.P.") 209 provides the general rules for pleadings in family law cases and parallels Idaho Rule of Civil Procedure 8. *Compare* I.R.F.L.P. 209, *with* I.R.C.P. 8. Pertinent here, I.R.F.L.P. 209 provides: "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense" and gives a non-exhaustive list of affirmative defenses. I.R.F.L.P. 209(c)(1). Compliance with statutory formalities in not an enumerated affirmative defense. *See id.* However, the list in IRFLP 209(c)(1) is not all inclusive, and this Court has recognized other affirmative defenses not listed in the Rule. *See Kenworth Sales Co. v. Skinner Trucking, Inc.*, 165 Idaho 938, 943–44, 454 P.3d 580, 585–586 (2019). Though *Kenworth* discusses affirmative defenses in the context of I.R.C.P. 8, that Rule is identical to I.R.F.L.P. 209 and offers guidance as to how this Court interprets I.R.F.L.P. 209.

An affirmative defense is a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are

9

true." *Id.* at 943, 454 P.3d at 585 (quoting *Affirmative Defense*, Black's Law Dictionary (11th ed. 2019)). The purpose of requiring affirmative defenses to be raised in a responsive pleading is "to alert the parties to the issues of fact which will be tried and to afford them an opportunity to present evidence to meet those defenses." *Id.* (citing *Williams v. Paxton*, 98 Idaho 155, 164, 559 P.2d 1123, 1132 (1976)). In general, a trial court may not raise an affirmative defense that has not been previously raised by the parties. *See Med. Recovery Servs., LLC v. Siler*, 162 Idaho 30, 65, 394 P.3d 73, 78 (2017).

We conclude a lack of compliance with Idaho Code section 32-917 is an affirmative defense. To illustrate, in his amended divorce petition Dexter alleged that "the parties entered into a **Property Settlement Agreement** . . . [and] petitioner requests that all of the terms and requirements of such **Property Settlement Agreement** be confirmed by this Court." (Emphasis in original.) Yet, Idaho courts will neither recognize nor enforce marital settlement agreements that are not "in writing and properly executed and acknowledged." *Dunagan v. Dunagan*, 147 Idaho 599, 601–02, 213 P.3d 384, 386–87 (2009) (citing I.C. § 32-917). Consequently, compliance with section 32-917 is an affirmative defense because it is an "assertion of facts and arguments that, if true, [would] defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true." *Kenworth Sales Co.*, 165 Idaho at 943–44, 454 P.3d at 585–586.

Here, Christine did not raise the PSA's compliance with section 32-917 in her answer to Dexter's amended petition for divorce. Nor did she argue before the magistrate court that the PSA failed to satisfy the statutory formalities. Indeed, the magistrate court expressly concluded that the PSA's compliance with section 32-917 was not at issue because "[n]either party argue[d] that the document fail[ed] in this regard." Thus, we hold Christine waived any argument relating to the PSA's lack of compliance with section 32-917 because she did not raise the defense in her answer or at any point before trial. *See Krinitt v. Idaho Dep't of Fish & Game*, 162 Idaho 425, 429–30, 398 P.3d 158, 162–63 (2017). Consequently, because Christine waived her potential defense under section 32-917 before the magistrate court, that issue was not preserved for appeal before the district court. *Siercke v. Siercke*, 167 Idaho 709, 715, 476 P.3d 376, 382 (2020). In addition, neither Christine's notice of appeal to the district court, nor her briefing on intermediate appeal, mention the procedural validity of the PSA. As such, even if she had preserved the issue before the magistrate court, she would have waived any argument on that issue by not presenting it for appeal before the district court. *See McVicars v. Christensen*, 156 Idaho 58, 64, 320 P.3d

948, 954 (2014) (stating that issues not supported by argument or authority in an opening brief will not be considered on appeal). We therefore hold that the district court erred in addressing that issue on intermediate appeal because the issue was not properly before it.

Christine argues that her supplemental authority filed under Idaho Appellate Rule 34 preserved the issue for appeal because the citation to this Court's recent decision in *Papin* put both the district court and Dexter on notice that Christine was arguing the PSA did not comply with section 32-917. We find that argument lacks merit. Idaho Appellate Rule 34 is not a vehicle for raising additional issues on appeal that have not been preserved below. The rule states:

> At any time before the issuance of an opinion, any party may supplement his brief by the citation of additional authority, *identifying the issue on appeal to which it pertains*, without written comment thereon, and identifying the headnote or relevant pages of the authority cited. This augmentation may be done by written notice to the court and all parties without first obtaining leave of the court.

I.A.R. 34(e)(1) (emphasis added). The plain language of the rule demonstrates that a filing under Idaho Appellate Rule 34(e) is limited to supplementing issues that have already been raised on appeal and may not be used to raise additional issues. As such, Christine's citation to *Papin* in her Idaho Appellate Rule 34 supplementation did not preserve any issue relating to section 32-917 because that issue had not been raised on appeal. We therefore reverse the district court's decision that the PSA was unenforceable because it failed to comply with the procedural requirements of Idaho Code section 32-917.

**B. The district court erred in concluding that the PSA violated public policy.**

In addition to its ruling on the procedural validity of the PSA, the district court concluded that the PSA was illegal because it was obtained through extortion. Specifically, the district court found that Dexter's warning to Christine that the divorce would get "nasty" if she did not sign the PSA constituted extortion, in violation of Idaho Code section 18-2403. Dexter challenges both the factual and legal sufficiency of the district court's ruling. Christine maintains that the district court's ruling was correct, and that Dexter's arguments muddle the issues and misapply the law.

Whether a contract violates public policy is a question of law that this Court freely reviews. *Quiring v. Quiring*, 130 Idaho 560, 566, 944 P.2d 695, 701 (1997) (citing *Stearns v. Williams*, 72 Idaho 276, 283, 240 P.2d 833, 840 (1952)). Any court may raise the illegality of a contract sua sponte and, in fact, has a duty to do so. *Barry v. Pac. W. Const., Inc.*, 140 Idaho 827, 832, 103 P.3d 440, 445 (2004) (citations omitted). In general, courts determine whether a

11

contract violates public policy by ascertaining "whether the contract has a *tendency* toward . . . an evil" antagonistic to the public interest. *Neustadt v. Colafranceschi*, 167 Idaho 214, 221, 469 P.3d 1, 8 (2020) (quoting *Hill v. Am. Family Mut. Ins. Co.*, 150 Idaho 619, 623, 249 P.3d 812, 816 (2011)). "Public policy may be found and set forth in the statutes, judicial decisions or the constitution." *Quiring*, 130 Idaho at 566, 944 P.2d at 701 (citing *Stearns*, 72 Idaho at 287, 240 P.2d at 842). Pertinent here, Idaho Code section 18-2403 provides:

> A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will:
>
> . . . .
>
> 5. Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or
>
> . . . .
>
> 9. Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.

I.C. § 18-2403(2)(e). The acts described above must be performed with the "intent to deprive another of property or to appropriate the same to himself." I.C. § 18-2403(1).

In *Quiring*, this Court invalidated a postnuptial agreement and quitclaim deed based, in part, on Idaho Code section 18-2403. 130 Idaho at 567–68, 944 P.2d at 702–03. There, the wife threatened to have the husband arrested at his place of work for sexually abusing her daughter if he did not sign a quitclaim deed giving the wife title to the marital home. *Id.* at 562, 944 P.2d at 697. The husband, in turn, refused to execute the quitclaim deed unless the wife signed a postnuptial agreement promising that she would not report the allegation of sexual abuse to law enforcement. *Id.* This Court invalidated both the quitclaim deed and postnuptial agreement on public policy grounds, concluding that the wife's threat to have the husband arrested if he did not deed her the marital home was theft by extortion. *Id.* at 567–68, 944 P.2d at 702–03.

Drawing on *Quiring*, the district court concluded that Dexter procured Christine's signature on the PSA through theft by extortion when he threatened that the divorce would get "nasty" if she did not sign it. It noted that the magistrate court not only found that Dexter had issued the threat, but that Christine would have to take the threat seriously given her affair and

12

concerns over her prior disclosures of childhood sexual abuse by her father. It also recounted Christine's trial testimony, where she stated:

> Him being nasty—after knowing this man for nine years, being married to this man for nine years, "nasty" to me meant nasty with my kids, nasty financially, *nasty with the reasons with my dad*. He had threatened many times to get a restraining order against my dad to explicit [sic] everything: *My family name, my dad, my whole family*. So when he says he's going to get nasty, I feel like this was him being gentle and soft in the fact that we were in a public place, the lobby in the middle of the NICU. And again, "nasty" being, yeah, we both didn't want a nasty divorce but nasty only on his terms that if I sign this or not.

(emphasis added). Thus, the district court determined, based on the magistrate court's findings and Christine's testimony, that Dexter had impliedly threatened to disclose the allegations concerning Christine's father if she did not sign the PSA or to perform some other act which was calculated to harm Christine. Given this determination, the district court ruled that the PSA was void and unenforceable because Dexter had threatened to expose Christine to hatred, contempt, or ridicule if she did not sign the PSA.

The parties' arguments on appeal focus on the actus reus requirement of Idaho Code section 18-2403. Dexter claims that section 18-2403 requires a specific, express threat. Christine, in contrast, maintains that an implied threat is sufficient to violate the statute. We find no occasion to address those arguments because we conclude that there is insufficient evidence of Dexter's intent to disclose these allegations or other personal details about Christine to support the district court's conclusion. The sole evidence that Christine provided to support her assertion that Dexter threatened to expose private details about her personal life is her subjective belief as to what Dexter meant when he stated that the divorce could get "nasty" if she failed to sign the PSA. Standing alone, Christine's subjective belief as to what Dexter meant by using a vague and ambiguous term like "nasty" is not enough to demonstrate that Dexter was threatening to expose some secret or perform some other act that would subject Christine to hatred, contempt, or ridicule. There is no evidence that Dexter was aware of Christine's affair at the time the PSA was executed. Further, Christine's contention is belied by the other, unchallenged, factual findings of the magistrate court. For example, the magistrate court found that Dexter's threat was issued consistent with the parties' previous discussions concerning their desire to avoid an acrimonious divorce. To be clear, threatening another with contentious or "nasty" divorce proceedings is not commendable nor unfortunately, uncommon behavior. However, under the circumstances of this case, there is insufficient evidence to support a conclusion that Dexter's statement that things

13

would get "nasty" indicated he would expose a family secret, publicize a salacious fact, or perform some other act that would subject Christine to hatred, contempt or ridicule or otherwise damage her reputation. Accordingly, we hold that the district court erred in concluding that the PSA was illegal because there is insufficient evidence to demonstrate that Dexter's statement constituted theft by extortion.

Because we hold that the district court erred in invalidating the PSA on both public policy grounds and for failing to satisfy statutory formalities, we also reverse the district court's conclusion that a valuation of the community estate must be undertaken on remand pursuant to Idaho Code section 32-901.

**C. The district court correctly affirmed the magistrate court's conclusions that the PSA was neither the product of overreaching nor unconscionable.**

The district court affirmed the magistrate court's findings of fact and conclusions of law regarding duress and overreaching. Christine argues that the district court erred because it applied the wrong legal standard to the overreaching analysis and did not address her argument on unconscionability. Dexter contends that the district court properly affirmed the magistrate court's conclusion on overreaching. Dexter also argues that although the district court did not address unconscionability, the magistrate court's analysis on that issue was correct and may be affirmed.

We conclude that the district court did not err in affirming the magistrate court's findings of fact and conclusions of law because substantial and competent evidence supported the magistrate court's findings and its conclusions followed therefrom. *Papin*, 166 Idaho at 18, 454 P.3d at 1101.

1. The district court properly affirmed the magistrate court's conclusion that Christine had not demonstrated overreaching.

The magistrate court concluded Dexter had not engaged in overreaching and the burden remained with Christine to affirmatively prove the reasons why the PSA should be set aside. The district court reached a similar conclusion, determining that the magistrate court applied the correct legal standard to the overreaching analysis and that its conclusions were supported by substantial and competent evidence.

Christine contends that both the magistrate court and district court misapplied the relevant law because the overreaching analysis requires the burden to shift to the party benefited by an unequal division of property if the agreement appears unfair to the other spouse. She also

14

contends that Dexter's threat that the divorce would turn nasty should have played a larger role in the analysis. Finally, she argues that neither the magistrate court nor the district court noted that Christine was unrepresented in their analysis. Dexter concedes that the burden shifts to the spouse benefited by a postnuptial agreement if both unfairness and overreaching are demonstrated. However, he disputes that Christine presented enough evidence for a finding of overreaching and, therefore, the magistrate court properly left the burden on Christine to prove the PSA was avoidable on other grounds.

In *Sande v. Sande*, 83 Idaho 233, 360 P.2d 998 (1961), this Court first discussed overreaching as a distinct basis on which a postnuptial agreement may be avoided. Since that time, we have only addressed the subject infrequently. We take this opportunity to clarify the proper standard for overreaching.

The facts in *Sande* were egregious. There, a husband, Pere, convinced his wife, Frances, to sign a postnuptial agreement through a series of lies and threats. 83 Idaho at 235, 360 P.2d at 999. Pere told Frances that he and a local sheriff had received a number of threatening and libelous letters purportedly written by Frances in Canada. *Id.* Pere represented to Frances that, because of these letters, he was at risk of losing "his fortune" because of the potential for civil lawsuits against him. *Id.* To protect himself (and Frances's interest in the community property) Pere convinced Frances to sign a one-sided postnuptial agreement, quitclaim various pieces of property to him, and divorce him. *Id.* He further stated that Frances should go to Canada, sell property she owned there, and "clear her name" so that she could return home and remarry Pere. *Id.* If Frances refused any of Pere's requests, he threatened to "institute insanity proceedings against her." *Id.* Frances signed the postnuptial agreement and agreed to a divorce. *Id.* Subsequently, Frances brought an action to have the postnuptial agreement and decree of divorce vacated, alleging that she was induced to enter into the postnuptial agreement by fraud and coercion. *Id.* The district court concluded that Frances had not carried her burden to establish fraud by clear and convincing evidence and, although the postnuptial agreement was "not a just agreement" there was no legal basis on which it could be set aside. *Id.* at 237, 360 P.2d at 1001. This Court reversed and concluded the agreement could be voidable on alternate grounds.

Applying now-defunct law, this Court reasoned that "the husband, as the manager of the community property, stands in a fiduciary relationship to the wife." *Sande*, 83 Idaho at 237, 360 P.2d at 1001. As such, this Court noted that

15

> Where a postnuptial property settlement is attacked by the wife on the ground of fraud, coercion or undue influence, the burden is upon the husband to show not only that the transaction was free from any taint of fraud, coercion, or undue influence on his part, but that the wife acted with full knowledge of the property involved and her rights therein, and that the settlement was fair and equitable.

*Id.* at 238, 360 P.3d at 1001. This Court looked to a variety of rules from other jurisdictions, explaining "[b]ecause of the dominating influence . . . a husband exercises over the wife, transactions between them to be valid . . . must be fair and reasonable and voluntarily and understandingly made. Such transactions are closely scrutinized to prevent the wife from being unfairly treated by the improper conduct of the husband." *Id.* at 239–40, 360 P.2d at 1002 (internal citations omitted). Further, this Court noted that "in a transaction between husband and wife by which the husband obtains an advantage, the presumption arises that it was obtained by undue influence and without consideration." *Id.* at 240, 360 P.2d at 1003 (citing *McKay v. McKay*, 195 P. 385 (Cal. 1921)).

Relying on the same set of authorities, which assumed that a husband occupied a position of greater knowledge and power than the wife, this Court in *Sande* also set out another general rule, stating:

> In addition to the rule placing the burden of proof on the husband, as above stated, *there is a further general rule* that where the separation agreement is inequitable and unfair to the wife, and where it manifestly appears there has been overreaching on the part of the husband, equity will not enforce the agreement, but will grant relief to the wife, even though no actual fraud or duress was resorted to by the husband in procuring it.

*Id.* at 241, 360 P.3d at 1003 (emphasis added).

To summarize, the *Sande* Court announced two rules, both rooted in the law of that time, which has since been superseded, that a husband had greater knowledge of and power over the community estate because he was the statutory manager of the community. The first rule shifted the burden to the husband to prove that any postnuptial property settlement agreement was fair and equitable under the circumstances, and not the product of fraud, coercion, or undue influence. The second rule allowed a wife to avoid a postnuptial agreement, even if there was not a showing of fraud or duress, if the agreement was inequitable and there had been manifest overreaching. This Court did not discuss what type(s) of conduct would constitute "manifest overreaching," nor did it conclude that Pere had overreached and if so, what conduct constituted overreaching. Rather, this Court held that the trial court erred in ruling that Frances could not

16

avoid the postnuptial agreement on a basis other than fraud or duress, and remanded the matter for further consideration in light of the above rules. *Id.* at 241–42, 360 P.2d at 1004.

Nearly twenty years later, in *Compton v. Compton*, this Court addressed the rules from *Sande* following a change in Idaho law that gave both spouses equal control over the community property. 101 Idaho 328, 335–36, 612 P.2d 1175, 1182–83 (1980); *see also* I.C. § 32-912 ("Either the husband or the wife shall have the right to manage and control the community property[.]"). In *Compton*, a wife, Lilian, challenged a postnuptial agreement with her husband, Roger, contending that it had been procured through misrepresentation and fraud. 101 Idaho at 331, 612 P.2d at 1178. The postnuptial agreement predominately benefited Roger, who received most of the community property. *Id.* at 331–32, 612 P.2d at 1178–79. Lilian alleged that she had little to no knowledge of the community property during the marriage and that Roger had represented to her that it was worth little prior to entering into the postnuptial agreement. *Id.* at 332, 612 P.2d at 1179. The district court granted summary judgment in Roger's favor, concluding that Lilian had not raised a genuine issue of material fact with respect to fraud or misrepresentation. *Id.*

In affirming the district court's summary judgment order, this Court addressed Roger's argument that Idaho Code section 32-912 removed the fiduciary duty he may have owed to Lilian. *Compton*, 101 Idaho at 335–36, 612 P.2d at 1182–83. This Court rejected this argument, reasoning that spouses owe each other reciprocal fiduciary duties, given their power to encumber the whole of the community property. *Id.* Further, this Court stated that the reciprocal fiduciary duties "extend[] to the parties' negotiations leading to the formation of the property settlement agreement during marriage, and requires . . . a disclosure by both parties of all information within their knowledge regarding the existence of community property and of pertinent facts necessary to arrive at a reasonable valuation of the property." *Id.* at 336, 612 P.2d at 1183. This Court continued, noting that "each spouse is free to adopt a position favorable to himself or herself regarding the property's valuation, its inclusion in the community, or other such issues." *Id.* However, a spouse cannot, consistent with their fiduciary obligations, "conceal[] the very existence of particular items or amounts of property." *Id.*

This Court then cited *Sande* for the premise that "where a separation agreement is unfair and inequitable, and where overreaching appears, the agreement may be avoided despite the absence of actual fraud or duress . . . [and that] overreaching automatically shifts the burden to

17

the party benefited by the unequal agreement to show that the community should not be reapportioned." *Id.* This Court also indicated that an unrepresented spouse is typical in cases where overreaching appears. *Id.* However, absent overreaching, this Court stated that the burden remains with the party challenging the postnuptial agreement. *Id.* Thus, this Court appears to have combined the two rules from *Sande*, injecting the burden shifting approach into the overreaching analysis. However, this Court ultimately affirmed the trial court's grant of summary judgment in favor of Roger because Lilian had access to and knowledge of the community estate at the time the postnuptial agreement was negotiated. *Id.* at 336–37; 612 P.2d at 1183–84. Consequently, this Court did not discuss what type(s) of conduct would constitute overreaching.

Next, in *Golder v. Golder*, this Court considered and upheld a district court's decision voiding a postnuptial agreement because it had been procured through fraud and overreaching. 110 Idaho 57, 714 P.2d 26 (1986). There, a husband, James, lied to his wife, Diane, about the value and existence of community property prior to executing a postnuptial agreement that gave him a disproportionate share of the community property. *Id.* at 60, 714 P.2d at 29. James also threatened Diane with custody litigation if she obtained independent counsel or disputed the postnuptial agreement. *Id.* at 61, 714 P.2d at 30. The postnuptial agreement was merged into the couple's divorce decree. *Id.* at 59, 714 P.2d at 28. Diane subsequently brought an independent action for relief from judgment under Idaho Rule of Civil Procedure 60(b), seeking to have the postnuptial agreement set aside. *Id.* In that context, this Court articulated the following overreaching standard: "Absent overreaching, the burden is on the claimant to prove each element of fraud by clear and convincing evidence. The presence of overreaching, however, 'automatically shifts the burden to the party benefited by the unequal agreement to show that the community should not be reapportioned.'" *Id.* at 59–60, 714 P.2d at 28–29 (internal citation omitted) (quoting *Compton*, 101 Idaho at 335, 612 P.2d at 1182). The rule from *Golder* diverged from that in *Compton* and *Sande*, as it indicated that overreaching shifted the burden to prove fraud, as opposed to shifting the burden to the spouse benefited by the agreement to demonstrate that it is fair and equitable under the circumstances. Further, this Court did not differentiate between conduct constituting overreaching and conduct constituting fraud. Instead, this Court affirmed the trial court's findings of fraud and overreaching based on James's failure to disclose,

18

misrepresentations concerning the value of the community estate, and threats related to the postnuptial agreement. *Id.* at 61, 714 P.2d at 30.

Most recently, in *Papin*, we reiterated that marriage imposes reciprocal fiduciary duties on spouses until the moment the marriage terminates. 166 Idaho at 20, 454 P.3d at 1103. We noted that those fiduciary duties extend to the negotiations for a postnuptial agreement, and require "at least, a disclosure by both parties of all the information within their knowledge regarding the existence of community property and of pertinent facts necessary to arrive at a reasonable valuation of the property." *Id.* However, we acknowledged that, like business partners, spouses are free to take positions favorable to themselves "regarding the property's valuation, its inclusion in the community, or other such issues." *Id.* This Court then quoted *Sande*, stating "[w]hen such an agreement is attacked the husband has the burden of clearly showing that it was fair in every particular." *Id.*

In sum, a review of our caselaw from *Sande* onward reveals the following rules regarding overreaching. To begin, spouses occupy a confidential relationship as a matter of law, and the fiduciary duties imposed by that relationship continue until the moment the marriage is terminated. *See Compton*, 101 Idaho 335–36, 612 P.2d at 1182–83. Because of this relationship, we scrutinize agreements between spouses more closely than a typical arm's length transaction. *Sande*, 83 Idaho 239, 360 P.2d at 1002. In particular, overreaching concerns fairness in the execution of a postnuptial agreement governing the division of property. *See id.* (considering whether a postnuptial agreement was fair and equitable "in view of the circumstances existing at the time of its execution").

During negotiations for a postnuptial agreement, a spouse is "free to adopt a position favorable to himself or herself regarding the property's valuation, its inclusion in the community, or other such issues." *Papin*, 166 Idaho at 20, 454 P.3d at 1103 (citing *Golder v. Golder*, 110 Idaho 57, 60, 714 P.2d 26, 29 (1986)). However, spouses are subject to a mandatory duty to disclose "all information within their knowledge regarding the existence of community property and of pertinent facts necessary to arrive at a reasonable valuation of the property." *Id.* Further, a spouse may not make a material misrepresentation of facts necessary to arrive at an informed decision regarding the existence or valuation of property in the postnuptial agreement. *See Golder*, 110 Idaho at 60, 714 P.2d at 29 (affirming a trial court's finding of overreaching where a

19

spouse made multiple false statements concerning the value of community property, existence of property, and liabilities of the community).

In addition to the mandatory duties described above, this Court stated in *Compton* that overreaching may be found "where one of the parties is not represented by independent counsel." *Compton*, 101 Idaho at 336, 612 P.2d at 1183. This statement was made in connection with a discussion of the burden-shifting rule in *Sande*. However, we note the burden shifting rule of *Sande* was premised on the legal concept that the husband was manager of the community property; a legal concept which has since been abandoned. Spouses now enjoy equal management of community property, and independent control over their separate property. I.C. §§ 32-904, 32-912; *see also Compton*, 101 Idaho at 335, 612 P.2d at 1182. We no longer assume, from a legal perspective, that a woman is somehow less than a man. As a result, much of the basis for the overreaching discussion in *Sande*, which has been carried through subsequent cases such as *Compton* and *Golder*, is no longer applicable. This includes our prior statement that overreaching often appears where a party is not represented by counsel.

However, we continue to recognize that spouses are in a confidential relationship and owe fiduciary duties to each other with regard to the community estate. *See, e.g.*, *Papin*, 166 Idaho at 20, 454 P.3d at 1103 ("The marital relationship imposes the high duty of care of a fiduciary on each of the parties."); *Smith v. Smith*, 124 Idaho 431, 440, 860 P.2d 634, 643 (1993) (same); I.C. § 32-901 ("Husband and wife contract toward each other obligations of mutual respect, fidelity and support."). So, while we no longer treat the wife as inferior or incapable of knowing the extent of the community property, we continue to recognize the fiduciary obligation to be forthright about the extent of the community estate when negotiating a postnuptial settlement agreement. In short, in the unique context of negotiating a postnuptial property settlement agreement, spouses are free to advocate for their own best interests, but must also provide a full and complete disclosure about the extent of the community estate. *See Papin*, 166 Idaho at 20, 454 P.3d at 1103; *Golder*, 110 Idaho at 60, 714 P.2d at 29; *Compton*, 101 Idaho at 336, 612 P.2d at 1183. This includes the obligation to disclose all pertinent facts necessary to arrive at a reasonable valuation of the property.

In light of the above discussion, we hold that overreaching will be established if a spouse challenging a postnuptial property settlement shows that the other spouse failed to disclose community property or pertinent facts necessary to arrive at a reasonable valuation of the

20

property. Thus, where a postnuptial agreement is unfair and inequitable, and where overreaching appears, the burden shifts to the spouse seeking to enforce the agreement to demonstrate that it is nonetheless fair and equitable under the circumstances. *See, e.g.*, *Papin*, 166 Idaho at 20.

We agree with the concurrence insofar as it suggests that one spouse being unrepresented is insufficient to establish overreaching. The history of our overreaching precedent discussed above demonstrates that only one factor—the failure to disclose material information—has been determinative of the overreaching analysis. To the extent the concurrence suggests that representation by counsel should remain a factor in the overreaching analysis, but not be determinative, the fact that a party is unrepresented would never change the outcome of a case. Rather, the analysis of whether a party engaged in overreaching would still turn on whether there was a failure to disclose material information. Accordingly, we find no utility in considering spousal representation in the overreaching analysis, especially when representation is relevant and may be considered in the context of other equitable doctrines such as duress and unconscionability.

Applying this rule to the facts of the present case, the magistrate court found that Dexter did not conceal property from Christine, that she knew the approximate profit/equity of the ranch because she signed the ranch's operating loan each year, and she had access to the ranch's books. The district court concluded that Dexter had neither withheld relevant information from Christine, nor fabricated information to secure her assent to the PSA. The magistrate court applied the proper standard in determining that Christine had failed to establish overreaching. The district court reached the same conclusion, reasoning that the magistrate court applied the correct standard and that its findings were supported by substantial and competent evidence.

We affirm the district court's decision affirming the magistrate court. Christine's argument that this Court's precedent on overreaching requires a burden shift anytime a postnuptial agreement effectuates an unequal distribution of property or anytime one spouse is unrepresented is unavailing. As noted above, a party seeking to shift the burden to the other spouse to establish a postnuptial agreement was fair and equitable on the grounds of overreaching must show that the other spouse failed to disclose community property or pertinent facts necessary to arrive at a reasonable valuation of the property. Only then will the burden shift to the opposite party to demonstrate that the postnuptial agreement is nonetheless fair and equitable. Both the magistrate court and district court applied this standard in reaching their

21

conclusions. Further, Christine does not dispute the magistrate court's findings that Dexter fully disclosed community property to her, she had a general awareness of the community estate, and that she had access to the ranch's books. Accordingly, the magistrate court properly declined to shift the burden to Dexter and we affirm the district court's decision affirming that conclusion.

2. <u>The district court did not err in affirming the magistrate court's ruling on unconscionability.</u>

In its decision affirming the magistrate court's findings of fact and conclusions of law, the district court failed to address the magistrate court's determination that the PSA was not unconscionable. Christine contends that the district court erred in not engaging in any analysis on the subject, and also that the magistrate court erred because the PSA was both procedurally and substantively unconscionable. Dexter concedes that the district court did not discuss unconscionability in its order on appeal, but disputes that any error occurred because its analysis on duress and overreaching adequately covered the issue. Furthermore, he argues that the magistrate court's order was proper, and the district court's decision affirming it may be upheld on that basis.

Preliminarily, we address whether the district court's failure to address the magistrate court's findings on unconscionability is a reversible error. Neither party disputes that the district court failed to address whether the magistrate court erred in concluding that the PSA was not unconscionable. Christine presented her argument on unconscionability to the magistrate court. To the extent that the district court failed to address a properly preserved argument, it erred. *See Boise Tower Assocs., LLC v. Hogland*, 147 Idaho 774, 782–84, 215 P.3d 494, 502–04 (2009). However, under the standard of review applicable to intermediate appellate decisions, this Court looks to the magistrate court record to determine whether its findings of fact are properly supported and whether its conclusions of law follow therefrom. *Bailey*, 153 Idaho at 529, 284 P.3d at 973 (citing *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008)). If the district court affirmed the magistrate court, and the magistrate court's order was properly supported, this Court may affirm the district court. *Id.* Thus, the district court's failure to discuss the magistrate court's unconscionability analysis does not present a barrier to this Court affirming (or reversing) the district court's decision, as this Court primarily considers the magistrate court's decision and affirms or reverses the district court's decision as a matter of procedure. *Id.*

22

A contract, or contractual provision, may be voided as unconscionable if it is both procedurally and substantively unconscionable. *Murphy v. Mid-West Life Ins. Co. of Tenn.*, 139 Idaho 330, 332, 78 P.3d 766, 768 (2003) (citing *Lovey v. Regence Blue Shield of Idaho*, 139 Idaho 37, 42, 72 P.3d 877, 882 (2003)). "Procedural unconscionability may arise when the contract 'was not the result of free bargaining between the parties.'" *Lovey*, 139 Idaho at 42, 72 P.3d at 882 (quoting *Nw. Pipeline Corp. v. Forrest Weaver Farm, Inc.*, 103 Idaho 180, 183, 646 P.2d 422, 425 (1982)). Generally, procedural unconscionability can be shown by either lack of voluntariness or lack of knowledge. *Id.* For instance, lack of voluntariness may be shown through "high-pressure tactics, coercion, oppression or threats short of duress." *Id.* (citing *Walker v. Am. Cyanamid Co.*, 130 Idaho 824, 830, 948 P.2d 1123, 1129 (1997)). Lack of knowledge may be shown through "lack of understanding regarding the contract terms arising from the use of inconspicuous print, ambiguous wording, or complex legalistic language . . . the lack of opportunity to study the contract and inquire about its terms . . . or disparity in the sophistication, knowledge, or experience of the parties." *Id.* (citations omitted).

Substantive unconscionability focuses only on the terms of the contract being examined. *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 145, 456 P.3d 201, 214 (2019). "A provision is substantively unconscionable if it is a bargain no reasonable person would make or that no fair and honest person would accept." *Id.* (quoting *Wattenbarger v. A.G. Edwards & Sons, Inc.*, 150 Idaho 308, 321, 246 P.3d 961, 974 (2010)). In considering substantive unconscionability, courts must consider "the purpose and effect of the terms at issue, the needs of both parties . . . , and the reasonableness of the terms at the time of contracting." *Wattenbarger*, 150 Idaho at 321, 246 P.3d at 974 (quoting *Lovey*, 139 Idaho at 43, 72 P.3d at 883). In other words, we analyze substantive unconscionability through the lens of a similarly situated reasonable person.

Below, the magistrate court concluded that the PSA was not procedurally unconscionable for largely the same reasons as it concluded that the PSA had not been signed under duress. That is, the magistrate court concluded that the PSA had been signed voluntarily because it was

> [1)] Signed at [Christine's] place of work where there was an area she could have retreated to and where [Dexter] could not follow. 2) The document itself speaks to the opportunity to seek input from counsel. 3) [Christine] is well educated and can handle her high stress job at the NICU. The stress of this decision would be something she was capable of handling. 4) Her work environment would have been supportive of her . . . 5) [Dexter] did not bring any third parties to further

23

influence the decision. 6) The document did reflect [Christine's ] wishes to get out of the marriage debt free with her automobile. 7) [Christine] has a well-respected job and would be able to be self-sustaining at the end of the marriage . . . 8) Other than the "nasty" threat there were no other threats of violence or physical pressure.

In short, the magistrate court found that the factors weighing in favor of finding that Christine voluntarily executed the PSA outweighed the factors showing that she was under intense emotional pressure to do so.

Similarly, as to substantive unconscionability, the magistrate court calculated the total value of the equity Dexter received pursuant to the PSA to be somewhere between $54,000 to $130,000. It noted that Christine received a vehicle worth $30,000 and had her student loans paid off. Accordingly, the magistrate court concluded that Christine gave up one-half of the potential equity (between $27,000 and $65,000) in exchange for what she received. On these facts, the magistrate court concluded that the PSA was not substantively unconscionable. And, on reconsideration, the magistrate court assumed "the value of the ranch is substantially greater than estimated" but still declined to reconsider its previous ruling because the valuation of the ranch was only one factor of many leading to its conclusion that the PSA was not substantively unconscionable. The only evidence in the record of the value of the assets Dexter received under the PSA was a balance sheet submitted as part of an operating loan application for the ranch.

Christine challenges the sufficiency of this conclusion, contending that the magistrate court's factual findings were insufficient. She notes that the balance sheet, executed by the parties about two weeks before the PSA indicated that the ranching operation—which Dexter received under the PSA—was valued at around $1.3 million. In contrast, she notes that the PSA only granted her a vehicle worth $30,000, payment of her student loans, and her anticipated future inheritance worth $250,000.

Dexter does not dispute that he received more under the PSA than Christine, but argues that Christine was aware of the inequitable division and accepted it based on various considerations other than property value. For instance, he notes that Christine's goals in executing the PSA included finalizing the divorce as soon as possible, attempting to facilitate child custody negotiations, keeping information about her personal life private, and leaving the marriage debt-free.

Regarding procedural unconscionability, we find that the magistrate court's conclusion follows from its factual findings that Christine executed the PSA voluntarily. As discussed

24

above, the magistrate court found that Dexter's threat that the divorce may turn nasty reflected the parties' previous discussions regarding their desire to avoid an acrimonious divorce. The evidence also indicated that Christine understood the property included in the PSA, as she had access to the ranch's books and signed the ranch's balance sheet each year to obtain an operating loan. Although Christine testified to not understanding some of the terms of the PSA, the magistrate court found that she did not disclose this to Dexter when the PSA was signed. Finally, the magistrate court considered that Christine's lack of representation weighed in favor of a conclusion that the PSA had not been signed voluntarily, but ultimately concluded that factor was outweighed by the other factors indicating voluntariness discussed above.

We conclude that the magistrate court's findings of fact were supported by substantial and competent evidence and its conclusion that the PSA was not procedurally unconscionable followed from those findings. Accordingly, we affirm the district court's decision affirming the magistrate court's findings of fact and conclusions of law.

As to substantive unconscionability, the evidence is conflicting and unclear regarding the exact value of the property Dexter received, but the magistrate court's findings are supported by substantial and competent evidence in the record. The magistrate court found that Dexter received, on the high end, about $130,000 in equity under the PSA. In comparison, Christine received a $30,000 vehicle, payment of her student loans, avoiding disclosure of sensitive personal information, and a release from all marital debt associated with the ranch. Given Christine's other concerns, such as expediting the divorce, making custody negotiations more amiable, and exiting the marriage debt-free, a similarly situated reasonable person may have agreed to the PSA. As a result, we affirm the district court's decision affirming the magistrate court's findings of fact and conclusions of law because the magistrate court's conclusions were adequately supported, and it properly applied the law.

**D.  Neither party is entitled to attorney fees on appeal.**

Both Dexter and Christine request attorney fees on appeal. Dexter requests fees pursuant to Idaho Code sections 12-121 and 12-123, as well as Idaho Rules of Family Law Procedure 901 and 908. Christine requests fees under Idaho Code sections 12-107 and 12-121.

1.  <u>Christine is not entitled to attorney fees.</u>

Dexter has prevailed on all issues on appeal and is, therefore, the prevailing party for purposes of our attorney fee analysis. Accordingly, we decline to award Christine attorney fees

under section 12-121 because that section only allows attorney fees for the prevailing party. *See* I.C. § 12-121. Idaho Code section 12-107 does not pertain to attorney fees, but rather allows an award of costs on appeal. I.C. § 12-107. We also decline to award Christine costs on appeal because she is not the prevailing party.

2. Dexter is not entitled to attorney fees.

Although Dexter has requested fees on various bases, he provides slim argument about why fees are appropriate. His argument, in full, reads "based on facts as set forth herein based on the clearly erroneous findings and actions of the district court on appeal . . . [a]ny defense of this appeal is inherently unreasonable."

A party seeking attorney fees must provide argument on the issue. *See* I.A.R. 35(a)(6). "Absent any legal analysis or argument, the mere reference to a request for attorney fees is not adequate." *Bromund v. Bromund*, 167 Idaho 925, 932, 477 P.3d 979, 986 (2020) (citing *Johnson v. Murphy*, 167 Idaho 167, 176, 468 P.3d 297, 306 (2020) (quotation and alterations omitted). We decline to award Dexter attorney fees on appeal because he has not sufficiently supported his request with legal authority or analysis.

## V. CONCLUSION

Based on the foregoing, we reverse in part and affirm in part the district court's intermediate appellate decision. The district court erred in ruling that the PSA was procedurally invalid because compliance with the statutory formalities is a waivable affirmative defense that Christine waived due to her failure to raise it below. Next, the district court erred in concluding that the PSA was illegal because there is insufficient evidence to establish that Dexter violated Idaho Code section 18-2403 when he threatened Christine that the divorce would get nasty if she did not sign the PSA. However, we affirm the district court's decision affirming the magistrate court's conclusion that the PSA was neither the product of overreaching nor unconscionable. Finally, we decline to award either party attorney fees on appeal. As the prevailing party, we award costs to Dexter on appeal.

Chief Justice BEVAN, Justice MOELLER and HIPPLER, J. Pro Tem, CONCUR.

STEGNER, J., concurring in the result.

I concur with the majority's conclusion that the property settlement agreement ("PSA") was not the product of overreaching. However, I write separately because I believe that establishing overreaching requires a broader inquiry than that articulated by the majority. In my

26

view, to determine whether overreaching occurred, a court should look at the totality of the circumstances surrounding both the terms and execution of the agreement. One consideration in this case stands out: Dexter was represented by counsel while Christine was not. In my view, the fact that one spouse is represented by counsel while the other is not should always be considered as part of an overreaching analysis. *See* 5 A.L.R. 823, *Validity of separation agreement as affected by fraud, coercion, unfairness, or mistake* (originally published in 1920) ("[W]hile evidence that one spouse was not represented by counsel is insufficient, standing alone, to find overreaching, it is a *significant consideration* when determining whether the parties entered into the stipulation freely and fairly.") (quoting *Jon v. Jon*, 123 A.D.3d 979, 979–80 (N.Y. App. Div. 2014)) (italics added).

Admittedly, this factor is not determinative in establishing that overreaching occurred but can (and should) be examined in consideration of the totality of the circumstances surrounding the enforceability of a PSA. "[C]ourts may examine the terms of the agreement *as well as the surrounding circumstances* to ascertain whether there has been overreaching." *Heinemann v. Heinemann*, 189 A.D.3d 1553, 1555, 139 N.Y.S.3d 340 (2020) (italics added).

In this case, the PSA signed by Christine contained a term that provided

> WHEREAS each party has had the opportunity to obtain independent legal advice prior to the execution of this Agreement, both parties state that they are not under duress and both parties consider themselves fully advised as to his or her rights hereunder and voluntarily and knowingly enter into this Agreement.

There is no dispute here that Christine did not have the opportunity to consult with an attorney when Dexter brought the agreement to her place of work for her to sign it. However, I agree with the majority that Christine did not demonstrate that her lack of counsel constituted overreaching by itself. I reach this conclusion because, while the terms of the PSA were not equal, Christine received exactly what she sought—her vehicle and student loans paid off and leaving the marriage with no debt. Under the totality of the circumstance, I cannot conclude that Dexter engaged in overreaching sufficient to cause the burden to shift to him.

To summarize, I would consider the totality of the circumstances surrounding the execution of a postnuptial property settlement agreement, including whether one of the spouses was represented by counsel, and the other was not, as one factor in determining whether overreaching occurred. I believe that one spouse's lack of representation by counsel, when the other is represented by counsel, should always be a factor when a court engages in an analysis to

determine whether overreaching has occurred. Had Christine established overreaching under a totality of the circumstances analysis, the burden would have then shifted to Dexter to prove that the PSA was fair and equitable under the circumstances. *Papin v. Papin*, 166 Idaho 9, 20 454 P.3d 1092, 1103 (2019). However, as noted, I do not think the burden shifted in this case.